#26773-rev & rem-JKK

**2014 S.D. 85**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

PATRICK WHITE FACE,                       Defendant and Appellant.


* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE WALLY EKLUND
Judge

* * * *

MARTY J. JACKLEY
Attorney General

PATRICIA ARCHER
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff
                                          and appellee.


THOMAS M. DIGGINS
Pennington County Public
  Defender's Office
Rapid City, South Dakota                  Attorneys for defendant
                                          and appellant.

* * * *

CONSIDERED ON BRIEFS
ON AUGUST 25, 2014

OPINION FILED **12/10/14**

#26773

KONENKAMP, Justice

[¶1.]	In a case where two separate and distinct incidents of abuse were alleged in a one-count indictment, the jury found Patrick White Face guilty of aggravated child abuse under SDCL 26-10-1. But the jurors were not instructed that to reach a verdict they would have to agree unanimously on at least one of the two allegations. In some circumstances, multiple instances of child abuse can be subsumed in one count, because separate incidents may be part of a continuous course of conduct. Yet here the State took the position that White Face could be found guilty based on either incident if not both. With the case so postured, there is no way to determine from the verdict whether all twelve jurors agreed upon the commission of the same act in order to convict White Face of the charged offense. Some jurors may have believed him guilty of the first incident and others may have thought him guilty of the second. Based on the language of the indictment and the way the State presented its case to the jury, we conclude that White Face was denied the right to a unanimous jury verdict.

## Background

[¶2.]	On March 24, 2011, White Face was caring for his six-week-old daughter, Pamela, and eighteen-month-old son, Phoenix, while the children's mother, Dana Fast Horse, was at work. White Face gave Pamela a bath and, as he would later recount, while putting a diaper on her, he heard what he described as a "snap" or "pop." He noticed that something appeared wrong with Pamela's leg. He took her to the emergency room. Dr. Donald Oliver treated Pamela, diagnosed her with a fractured femur, and placed her leg in a Pavlik harness to promote healing.

Dr. Oliver conducted a number of tests, none of which provided an explanation for Pamela's broken femur. No bruising and no other broken bones or injuries were found. He questioned White Face about Pamela's care. White Face explained that he was changing Pamela's diaper when he heard a "snap" or "pop." Based on his thirty-plus years of experience as a pediatrician, Dr. Oliver believed that an infant with no abnormalities, such as Pamela, would not have been injured in the way White Face described. Dr. Oliver concluded that Pamela's injury was a "non-accidental" trauma.

[¶3.] Law enforcement authorities and the Department of Social Services (DSS) were contacted, and an officer and a caseworker came to the hospital. By this time, Dana had arrived, as well. Investigator Dan Wardle interviewed White Face and Dana about Pamela's care. White Face relayed the same story to Investigator Wardle as he did to Dr. Oliver. DSS created a protective plan: instead of removing Phoenix and Pamela from White Face's and Dana's care, DSS asked White Face to agree to leave the home and have no contact with the children. He agreed. But that night he went home and continued to live with Dana and the children.

[¶4.] Four days later, on March 28, 2011, White Face was again caring for Pamela and Phoenix while Dana was working. Around 5:00 p.m., Dana returned home from work. She checked on Pamela and found her sleeping on the bed. According to Dana, Pamela appeared normal. Shortly thereafter, Judy Lefholz, a nurse with the Bright Start Home Visiting Program, arrived for a visit. Judy had been working with Dana on parenting, nutrition, and in providing support since Dana's pregnancy with Phoenix. During the visit she did not see Pamela because

Dana told her Pamela was sleeping. She was unaware that DSS had a protective plan in place and that White Face was not to be in the home. Nor did she know he was in the bedroom with Pamela and Phoenix. Dana later testified that she did not tell Judy about the protective plan or that White Face was in the room with the children because she was worried DSS would take her children away.

[¶5.] After Judy left, Dana went to the bedroom and noticed that Pamela had been moved and something was seriously wrong. Her skin was gray; her eyes were rolled back; she was barely breathing. Dana asked White Face what happened and if Pamela had eaten. He replied that Pamela had only eaten a small amount for the day. Dana called her sister, whose boyfriend ultimately rushed Dana and Pamela to the hospital. White Face stayed home with Phoenix. White Face was later contacted by Investigator Jon Kirk, who asked him to come to the police station to answer questions. Investigator Kirk did not place White Face under arrest, and after the interview, White Face joined Dana at the hospital.

[¶6.] At the hospital, Pamela was in a coma and, according to Dr. Oliver, had a life-threatening blood sugar level. She was intubated and put on a ventilator. Dr. Oliver conducted multiple tests, but could not determine the cause of Pamela's condition. She was air-lifted to the Children's Hospital in Denver, Colorado. Her treating physician at the Children's Hospital, Dr. Curtis Ford, later explained that Pamela arrived with multi-organ system failure and needed life support. She continued to have low blood sugar and also suffered repeated seizures, severe liver damage, and brain injuries. After several days, Pamela's medical team, Dana, and White Face decided to take Pamela off life support. She was not expected to live,

but after the life support was removed, she continued to sustain herself. Her prospects for quality of life, however, would never be the same: she had permanent brain damage and continuing seizures. She would require long-term occupational and physical therapy.

[¶7.] In April 2011, White Face was indicted on a charge of aggravated child abuse in violation of SDCL 26-10-1, occurring on March 24, 2011. Defense counsel filed multiple motions, including a motion to require the State to specify character and other act evidence it intended to introduce at trial. The motion was granted, but the State did not submit a notice of other acts evidence. In August 2011, a new indictment issued charging White Face with aggravated child abuse between March 24, 2011 and March 28, 2011. The State then dismissed the earlier indictment.

[¶8.] During a status hearing in January 2013, Attorney Thomas Diggins of the Pennington County Public Defender's Office informed the circuit court that White Face's original counsel had resigned from her position in the office and that he and co-counsel, Attorney Jamy Patterson, would represent White Face. Before trial, Attorney Diggins indicated counsels' intent to proceed and not request a continuance. White Face confirmed he was comfortable moving forward with his current attorneys. During the trial, the State presented testimony from Drs. Oliver and Ford, Investigators Kirk and Wardle, Dana, Dana's sister, and Judy Lefholz.

[¶9.] Dr. Oliver testified about the care he provided to Pamela on March 24 for her fractured leg, including the tests he ran to rule out bone abnormalities and signs of other trauma. He believed Pamela's fractured leg was caused by "non-accidental" trauma. He explained that Pamela did not test positive for any

abnormalities, was otherwise a healthy infant, and a broken femur would not occur in the way White Face described. In regard to the March 28 incident, Dr. Oliver expressed concern that it was also caused by non-accidental trauma because "the child suffered extreme harm twice in the father's care."

[¶10.] Dr. Ford testified about both Pamela's leg fracture and the care he provided when she arrived at the Children's Hospital with multi-organ system failure. He detailed for the jury the various tests he and his team conducted. He concluded that the cause of Pamela's organ failure and resulting brain injury was lack of oxygen to the brain from something obstructing Pamela's airway, not allowing her to breathe. Dr. Ford explained the various ways Pamela's airway could have been blocked, including smothering. Because White Face was her sole provider during both incidents, Dr. Ford testified that "[i]t gives a pattern of who was around Pamela at the time[.]" Because Pamela had a brain injury four days after the injury to the leg, Dr. Ford expressed concern, stating, "We have a very vulnerable, very young infant, who has two serious and one very life-threatening injury within a short period of time. And both are very rare under normal circumstances to occur." Pamela suffered, he said, "[t]wo very serious injuries and two very rare things to happen to a child" under the care of the same person. In Dr. Ford's assessment, Pamela's broken leg and brain injury were non-accidental in nature.

[¶11.] Dr. John Plunkett, a forensic pathologist, testified for the defense that, based on his review of the medical records, there was no way to determine if Pamela's broken femur was caused by accidental or non-accidental trauma: "It's an

unusual event, but it does occur." He further opined that Pamela's medical condition on March 28 could have been caused by her abnormally low blood sugar. Smothering, he said, would not have caused her blood sugar to be so low, and therefore, smothering was not the cause of her resulting brain injury. He disagreed with Dr. Ford's opinion that lack of oxygen was the precipitating cause of Pamela's seizures and multi-organ system failure. Rather, he opined that the cause could not be determined.

[¶12.]     During the settling of the jury instructions, defense counsel requested that the jury be instructed that they must determine guilt or innocence on each incident, the one on March 24 and the one on March 28. In particular, counsel stated,

> Originally, this case only had the March 24th incident. The State was then going to use the March 28th incident and there was a 404(b) issue, and then it got dismissed. When it was refiled, it was refiled and says, between the dates of March 24th and March 28th, inclusive. The State has been very clear in their presentation of what they believe the evidence is, that they are asking the jury to convict Mr. White Face for these two acts, that these two acts constitute aggravated child abuse.
>
> The charging document is interesting in and of itself, but in essence, there is a concern without a jury instruction there could be seven jurors that believe March 24th happened and five jurors that believe March 28th happened, and together you come and you have twelve. And if that is the case, then the State has not proven their case as the law would require and it would be an injustice to Mr. White Face.
>
> So I believe that the jury needs to be instructed that in order to come back with a unanimous vote for guilty of aggravated child abuse, they need to all unanimously, each on their own, find that the State has proven beyond a reasonable doubt that March 24th occurred and that beyond a reasonable doubt March 28th occurred because if they don't, there could be that problem as well as the State in essence was able to try to do a 404(b) type

litigation without actually having fully litigated that theory in the process.

The State responded,

The State is — on the record the State is alleging from the get-go of this case from the time this indictment was filed that we are alleging that child abuse occurred between the dates of March 24, 2011, and March 28, 2011. The defense essentially is trying to say there should have been two separate child abuse counts filed and that was not the choice that the State made. I have provided authority to the court, if the court would take it as part of the record. It's a document I've provided to counsel as well as the clerk. It essentially says that when there's a pattern of physical trauma inflicted on a child in a relatively short period of time — and the other cases list similar type situations where the State — there does not need to be jury unanimity regarding the individual acts.

In this case the State has properly charged the crime over a course of time. The defense is trying to say we have to prove those individually and that's just not the case here.

The court refused White Face's requested jury instruction.

[¶13.] The jury returned a verdict of guilty on the single count of aggravated child abuse. Defense counsel asked the court to poll the jury and ask "if each juror found the State has proved beyond a reasonable doubt that both the March 24th incident was aggravated child abuse . . . and the March 28th incident was aggravated child abuse." The court declined and replied that it would poll the jury in its standard fashion. The court later imposed a sentence of twenty-five years in prison, with five years suspended, and ordered restitution of $437,603.07.

[¶14.] White Face appeals asserting error in: (1) awarding restitution; (2) denying White Face's request to instruct the jury to make separate findings for the two separate offenses charged in the one-count indictment; (3) failing to vacate the conviction based upon the duplicitous indictment and the lack of unanimity in the

verdict; (4) denying a motion for two new trials; (5) denying effective assistance of counsel; and (6) failing to recognize the State's prejudicial misconduct by dismissing the original indictment and obtaining a second indictment alleging two criminal acts in a single count.[1]

### Lack of Unanimity in the Verdict

[¶15.]     White Face contends that the indictment against him was duplicitous, because it charged two separate incidents in a single count of aggravated child abuse.  One "vice of duplicity is that because the jury has multiple offenses to consider under a single count, the jury may convict without reaching a unanimous agreement on the same act, thereby implicating the defendant's right to jury unanimity." *State v. Muhm*, 2009 S.D. 100, ¶ 29, 775 N.W.2d 508, 517.  White Face concedes he failed to raise the issue of duplicity in the indictment before trial as required by SDCL 23A-8-3(3).  In accord with this statute, defects in an indictment "must be raised prior to trial[.]" *See id.*  Thus, the issue of a defective indictment was waived.

---

1.     Standard of Review: "Whether an indictment is . . . duplicitous is a question of law reviewed de novo." *State v. Muhm*, 2009 S.D. 100, ¶ 18, 775 N.W.2d 508, 514.  We review claims of a violation of due process de novo, and thus, whether a unanimity instruction was required to ensure a defendant's due process rights is a question of law. *State v. Tiegen*, 2008 S.D. 6, ¶ 14, 744 N.W.2d 578, 585 (employing de novo standard of review to a claimed constitutional error).  We review a court's refusal of a requested jury instruction for an abuse of discretion. *State v. Webster*, 2001 S.D. 141, ¶ 7, 637 N.W.2d 392, 394.  We similarly review a court's denial of a defendant's motion for a new trial for an abuse of discretion. *State v. Zephier*, 2012 S.D. 16, ¶ 15, 810 N.W.2d 770, 773.

[¶16.]     White Face next argues that his failure to timely raise the duplicitous indictment issue did not absolve the circuit court of its duty to ensure that any verdict was unanimous.  Both the United States and South Dakota Constitutions grant an accused the right to a jury trial.  U.S. Const. amends. VI, XIV; S.D. Const. art. VI, § 7.  By statute in South Dakota, verdicts in criminal cases must be unanimous.  SDCL 23A-26-1.  White Face asserts that the court abused its discretion when it denied his requested jury instruction on unanimity.  He further contends that even if the court did not abuse its discretion when it denied his proposed instruction, the circuit court had a duty to instruct the jury that it must unanimously find White Face guilty of "at least one of the charges in the duplicitous count."  *See Muhm*, 2009 S.D. 100, ¶ 32, 775 N.W.2d at 519.

[¶17.]     In response, the State argues that no specific unanimity instruction was required because this case did not involve a single-act offense, but instead presented a "course of conduct."  In the State's view, "the jury did not have to unanimously agree on any one particular act, but had to unanimously agree that the State proved the overall offense of aggravated child abuse."  The State contends that if error did occur and was not waived, the error was harmless, because "it is likely the jury found beyond a reasonable doubt that [White Face] committed aggravated child abuse on *both* dates presented by the evidence."

[¶18.]     We first review whether the circuit court erred when it refused White Face's requested instruction.  "Trial courts possess broad discretion in instructing the jury." *State v. Pellegrino*, 1998 S.D. 39, ¶ 9, 577 N.W.2d 590, 594.  With a proper request, however, "defendants are entitled to instructions on their defense

theories if evidence supports them." *Id.* But no abuse of discretion will be found "in the refusal of a proposed jury instruction that does not represent a correct statement of the law." *State v. Downing*, 2002 S.D. 148, ¶ 27, 654 N.W.2d 793, 801 (per curiam). White Face's proposed instruction was not a proper statement of the law, because it required unanimity on both incidents as if they were charged as separate counts. White Face was not indicted on two counts of aggravated child abuse, and therefore, the State was not required to prove beyond a reasonable doubt that he committed aggravated child abuse on March 24 *and* March 28: the evidence could have supported a conviction on either incident. The circuit court did not abuse its discretion when it denied White Face's requested instruction.

[¶19.]     Did the trial court have a duty sua sponte to properly instruct the jury on unanimity? A defendant has a due process right to a unanimous jury verdict. *See Muhm*, 2009 S.D. 100, ¶ 29, 775 N.W.2d at 517. Contrary to the State's claim, White Face did not waive this issue. Defense counsel made clear to the court that unanimity was a concern and requested an instruction on jury unanimity. Moreover, multiple courts have held that a trial court has a duty to instruct sua sponte on unanimity when the evidence requires, and a defendant's failure to assert the issue does not constitute a waiver. *See State v. Crane*, 804 P.2d 10, 16 (Wash. 1991) (issue can be raised for the first time on appeal); *see also People v. Dieguez*, 89 Cal. App. 4th 266, 275 (2001); *Cody v. State*, 361 P.2d 307, 320 (Okla. Crim. App. 1961); *Ngo v. State*, 175 S.W.3d 738, 748 (Tex. Crim. App. 2005); *State v. Lomagro*, 335 N.W.2d 583, 590 n.3 (Wis. 1983).

[¶20.]    When evidence of several acts is presented at trial, any one of which could constitute the basis for the single offense charged, trial courts can take one of two actions: (1) require the prosecution to elect the transaction on which it relies for the conviction, or (2) give a unanimity instruction telling the jurors that they must unanimously agree that the defendant committed the same act or acts or that the defendant committed all the acts offered in evidence.  *Muhm*, 2009 S.D. 100, ¶ 32, 775 N.W.2d at 518-19 (either or rule) (citing 1A Charles A. Wright et al., *Federal Practice and Procedure* § 145 (4th ed. 2014)); *State v. Weaver*, 964 P.2d 713, 720 (Mont. 1998).  Unanimity is at risk when the evidence at trial suggests more than one distinct crime or the jury has multiple offenses to consider under a single count. *Muhm*, 2009 S.D. 100, ¶ 29, 775 N.W.2d at 517.   In these circumstances, "a general verdict may not reveal whether the jury unanimously found the defendant guilty of one offense or more offenses, or guilty of one offense and not guilty of others."  *Id.*; *see also State v. Brende*, 2013 S.D. 56, ¶ 13, 835 N.W.2d 131, 137.

[¶21.]    But the above requirements are not implicated, even though the evidence suggests more than one distinct crime, when the case falls within a continuing course of conduct.  *People v. Vargas*, 204 Cal. App. 3d 1455, 1464 (1988). Under the continuing course of conduct doctrine, when "the evidence establishes a pattern of physical trauma inflicted upon a child within a relatively short period of time, *a single course of conduct is involved* and no justification exists for departing from the well-established rule . . . that jury unanimity is not required" on the underlying conduct constituting child abuse.  *Id.*  Here, the State contends that neither an election nor a unanimity instruction was required because it charged

White Face with one count of aggravated child abuse alleged to have occurred over a period of time and presented the case as a continuous course of conduct. In the State's view, the abuse was continuous because, after White Face broke Pamela's femur and was not to be in the home, he smothered Pamela on March 28 to keep her quiet so as not to be discovered by the Bright Start nurse working with Dana.

[¶22.] Much of the analytical difficulty in child abuse cases lies in determining when multiple acts constitute separate offenses and when they encompass a single offense. Juror unanimity is not required when the crime charged involves a continuous course of conduct or a series of related acts over a period of time, and aggravated child abuse under SDCL 26-10-1 can be such a crime. *People v. Napoles*, 104 Cal. App. 4th 108, 115 (2002). Our statute provides: "Any person who abuses, exposes, tortures, torments, or cruelly punishes a minor in a manner which does not constitute aggravated assault, is guilty of a Class 4 felony." SDCL 26-10-1. Although abuse, torture, torment, and cruelly punish are not defined in the statute, a plain reading of this language indicates that the primary purpose is to criminalize acts of child abuse, whether it occurs in single or multiple acts. The terms do not contemplate that abuse will in all instances be complete upon a single act. This is because in child abuse cases it is possible that several acts, considered individually, might not amount to a commission of the offense, but the cumulative effect of the multiple injuries constitutes a crime. *Vargas*, 204 Cal. App. 3d at 1461. On the other hand, "child abuse is not invariably charged as a course of conduct offense; one act or omission constituting abuse may be sufficient for conviction." *Napoles*, 104 Cal. App. 4th at 116. Based on the

language of SDCL 26-10-1, we think the Legislature intended for the offense of child abuse to include both a single act of abuse, as well as a continuing course of abusive acts.[2] Thus, a unanimity instruction in child abuse cases will be required in some instances but not others.

[¶23.] In determining when to give the unanimity instruction, trial courts "must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, [the court] should give the unanimity instruction." *People v. Russo*, 25 Cal. 4th 1124, 1135 (2001). In assessing the evidence, the defendant's acts should be viewed in a "commonsense manner," taking into account "whether the acts occurred in 'a separate time frame'" or separate "'identifying place.'" *State v. Marko*, 27 P.3d 228, 231 (Wash. Ct. App. 2001) (quoting *State v. Petrich*, 683 P. 2d 173, 177 (Wash. 1984)).

[¶24.] For several reasons, we conclude that this case presents the first situation, where a special unanimity instruction was required. First, the evidence and expert opinion did not suggest a pattern of continuous abuse but two discrete incidents — the infant's broken femur and, days later, her sudden systemic failure. Other than stating that one of the reasons for concluding that both the child's

---

2. In *State v. Augustine*, in the context of double jeopardy, we said, "Each time an adult abuses a child, it is a separate, isolated impulse; not an inherently continuous offense. Individual acts of child abuse, especially when not shown to be inflicted simultaneously, constitute successive violations of SDCL 26-10-1 . . . ." 2000 S.D. 93, ¶ 24, 614 N.W.2d 796, 799.

injuries were not accidental was because the child was alone with White Face, neither Dr. Oliver nor Dr. Ford opined that the injuries inflicted upon Pamela on March 24 and March 28 formed a pattern of abuse or constituted battered child syndrome. *See, e.g.*, *Vargas*, 204 Cal. App. 3d at 1462 (burns, bruises, contusions, whipping injuries, and bites within a 10-day period); *Steichen v. Weber*, 2009 S.D. 4, ¶ 13, 760 N.W.2d 381, 389. And the risk of division among the jurors was a significant potential here because the mechanism of injury to the child was not clear. Circumstantially, the evidence pointed to White Face: he was alone with the infant on both occasions when her traumatic incidents occurred. But jurors could have easily divided on which incident, if not both, the defendant was responsible for.

[¶25.]      Second, the State invited the jury to convict on either incident, if not both, thus elevating the risk the jury could divide on the two offenses and not all agree on one particular offense. In closing argument, one of the prosecutors remarked: "I believe the State's shown beyond any reasonable doubt on both the March 24th and the March 28th incident that there was a violation of the statute involving child abuse. You think — one or the other is good enough, you can still find guilty on one or the other or both. I think the totality of the circumstances as a whole, it's child abuse." Under these circumstances, we cannot be reasonably certain that White Face was found guilty by a unanimous jury.

[¶26.]      We conclude that the State presented two incidents of trauma, each of which could have formed the basis of aggravated child abuse under SDCL 26-10-1, and the instructions given only informed the jury that the verdict must be

unanimous. The circuit court erred by not providing the jury with a special unanimity instruction requiring it to agree on the act supporting the conviction or find that White Face had committed both acts of child abuse. In view of our decision, we need not reach White Face's remaining appellate issues.

[¶27.]     Reversed and remanded for a new trial.

[¶28.]     GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and WILBUR, Justices, concur.